### SALSEDO v. PALMER et al.

(Circuit Court of Appeals, Second Circuit. December 14, 1921.)

No. 59.

**1. Death ☞11—Recovery unauthorized at common law.**

No action lies at common law to recover damages for causing the death of a human being by the wrongful or negligent act of another.

**2. Death ☞17—Wrongful act must be proximate cause.**

To sustain an action for death, under Code Civ. Proc. N. Y. § 1902, giving a right of action for death from wrongful act, neglect, or default, the wrongful act, neglect, or default must have been the proximate cause of the death.

**3. Negligence ☞60—"Proximate cause" and "remote cause" distinguished.**

The "proximate cause" is one in which is involved the idea of necessity, and one from which the effect must follow, while the "remote cause," although necessary for the existence of the effect, is one the existence of which does not necessarily imply the existence of the effect.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Proximate Cause; Remote Cause.]

**4. Negligence ☞58—Proximate cause of injury defined.**

In determining whether an act was the proximate cause of an injury, the question always is whether there was an unbroken connection between the wrongful act and the injury, and to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligent or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances.

**5. Death ☞17—Wrongful treatment of prisoner held not proximate cause of death from suicide.**

If, as alleged, defendants held plaintiff in confinement, assaulted him, and subjected him to mental torture, and thereby he was caused to lose control of his mind, and to become suicidally despondent and mentally irresponsible, with the result that he threw himself from a window causing his death, the wrongful acts were not the proximate cause of the death, as the suicide was an intervening act, if the killing was deliberate, while, if it was the result of suicidal mania, such mania was not a natural or reasonable result of the mental or physical torture.

Mayer, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Action by Maria Salsedo, as administratrix of Andrea Salsedo, deceased, against A. Mitchell Palmer and others. From a judgment for defendants on demurrer, plaintiff brings error. Affirmed.

Hale, Nelles & Shorr, of New York City (Walter Nelles, of New York City, of counsel), for plaintiff in error.

William Hayward, U. S. Atty., of New York City (Keith Lorenz, Asst. U. S. Atty., of New York City, of counsel), for defendants in error.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. This action was commenced on January 4, 1921, in the Supreme Court of the state of New York for the county of New York, by the plaintiff as administratrix of her deceased husband. The action is brought to recover damages for causing the death of the plaintiff's intestate. The complaint alleges that the defendants and each of them caused the death of the decedent by the acts set forth therein and which may be found in the margin.[1]

The plaintiff is an alien being a subject of the kingdom of Italy. The defendant A. Mitchell Palmer was, during the period of the acts herein involved, the Attorney General of the United States. He filed a petition in the United States District Court for the Southern District of New York, in which among other things he averred that the plaintiff was an alien and that he himself was a resident of the state of Pennsylvania, and asked that the case might be removed to the District Court in pursuance of the act of Congress in such case made and provided. This petition was granted, and on February 18, 1921, the cause was removed from the state court into the District Court.

Thereafter, and on February 24, 1921, the defendant Palmer demurred to the complaint, upon the ground that it did not state facts sufficient to constitute a cause of action. The other defendants joined in a similar demurrer. On the same day an order was entered requiring defendants to show cause why the demurrers should not be forthwith determined and judgment entered for the plaintiff upon the pleadings: and on February 28, 1921, an order sustaining the demurrers was entered, the complaint was dismissed upon the merits, and judgment was entered for the defendants against the plaintiff upon the merits and for their costs.

[1] This is an action brought by an administratrix to recover damages for causing the death of her decedent husband by alleged wrongful acts. Although there are some cases which maintain a contrary view,[2]

---

[1] The complaint alleges that the defendants caused the death of the decedent by the following acts and conduct: "They lawlessly and wrongfully arrested and seized his body and held him in confinement and captivity without process of law and against his will. They assaulted him. They inflicted upon him blows and grievous bodily injuries. They subjected him against his will to repeated interrogations and inquisitions. In, during, and throughout said period the defendants and each of them tortured the said Andrea Salsedo mentally by the following acts and conduct: They threatened to inflict upon him grievous physical injury and death, and to cause his prosecution, conviction and imprisonment for a crime of which he was innocent; and they made and broke repeated promises to set him free. They caused him to believe, and he did believe, that they had present power and ability to inflict upon him said wrongs with which they threatened him and they caused him to be and live in constant fear. In and by said tortures the defendants and each of them caused said Andrea Salsedo to lose control of his mind and will, and to become suicidally despondent and mentally irresponsible for his own conduct, with the result that on or about May 3, 1920, he projected his body from a window of his chamber of confinement in the premises occupied by the so-called Department of Justice on the fourteenth story of the building at Park Row, New York City, to the pavement of the street below, and died."

[2] Cross v. Guthery, 2 Root (Conn.) 90, 1 Am. Dec. 61; Shields v. Yonge, 15 Ga. 349, 60 Am. Dec. 698.

it is now well established that no action lies at common law to recover damages for causing the death of a human being by the wrongful or negligent act of another. St. Louis, etc., R. Co. v. Craft, 237 U. S. 648, 35 Sup. Ct. 704, 59 L. Ed. 1160; Michigan Central R. Co. v. Vreeland, 227 U. S. 59, 33 Sup. Ct. 192, 57 L. Ed. 417, Ann. Cas. 1914C, 176; Stewart v. Baltimore, etc., R. Co., 168 U. S. 445, 18 Sup. Ct. 105, 42 L. Ed. 537. It is a maxim of the law that "actio personalis moritur cum persona." The rule was most justly criticized as extremely technical and unsound in principle. It was changed by statute in England, but not until 1848, when Lord Campbell's Act was passed. The Congress by the act of June 11, 1906, made common carriers engaged in commerce between the states and between the states and foreign nations, as well as in the District of Columbia and the territories, liable for death caused to their employees resulting from negligence of such carriers. 34 U. S. St. at L. part 1, p. 232, c. 3073. See, also, 35 U. S. St. at L. 65, c. 149 (Comp. St. §§ 8657–8665); 36 U. S. St. at L. 291, c. 143 (Comp. St. §§ 1010, 8662, 8665). And in most of the states statutes similar to Lord Campbell's Act have been passed, and it is interesting to observe that the year before Lord Campbell's Act was passed the state of New York enacted a statute giving a right of action whenever the death was caused by wrongful act, neglect, or default, and the act, neglect, or default was such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof. Laws of New York 1847, vol. 2, c. 450, p. 575. And see Laws of 1849, c. 256. p. 388; Laws of 1870, vol. 1, c. 78, p. 215; Laws of 1909, vol. 1, c. 221, p. 346.

[2] The present action is brought under section 1902 of the New York Code of Civil Procedure, the material part of which is as follows:

"The executor or administrator duly appointed in this state, or in any other state, territory or district of the United States, or in any foreign country, of a decedent who has left him or her surviving a husband, wife, or next of kin, may maintain an action to recover damages for a wrongful act, neglect or default, by which the decedent's death was caused, against a natural person who, or a corporation which, would have been liable to an action in favor of the decedent by reason thereof if death had not ensued."

To sustain an action for death, the wrongful act, neglect, or default must have been the proximate cause of the death. Scheffer v. Washington City Midland, etc., R. Co., 105 U. S. 249, 26 L. Ed. 1070; Mella v. Northern S. S. Co., 162 Fed. 499; Seifter v. Brooklyn Heights R. Co., 169 N. Y. 254, 62 N. E. 349.

The maxim "In jure non remota causa sed proxima spectatur" applies in such a case as the one now before the court. That maxim is thus paraphrased by Lord Bacon in his constantly cited gloss:

"It were infinite for the law to consider the causes of causes, and their impulsions one of another; therefore it contenteth itself with the immediate cause, and judgeth of acts by that, without looking to any further degree." Bac. Max. reg. 1.

This is the first of Lord Bacon's maxims. Its meaning is that in ascertaining the cause of an injury in order to fix liability therefor one cannot go behind the last cause. The final cause and its immediate effect alone concern the court. Liability for result and responsibility

for final cause are regarded as inseparable. If one is responsible for the proximate cause one must be responsible for the result. And it has been pointed out that the general grounds of liability for a tort are not different from those which determine criminal liability. 9 Harvard Law Review, p. 84.

Addison on Torts (8th Ed.) p. 51, declares the rule of law to be that the immediate cause, the causa proxima, of the damage, and not the remote cause, is to be looked at. "If the wrong and the legal damage," the writer says, "are not known by common experience to be usually in sequence, and the damage does not, according to the ordinary course of events, follow from the wrong, the wrong and the damage are not sufficiently conjoined, as cause and effect, to support an action, unless it is shown that the wrongdoer knew, or had reasonable means of knowing, that the consequences not usually resulting from his act were, by reason of some existing cause, likely to intervene so as to cause damage to another."

In Pollock on Torts (11th Ed.) p. 29, that distinguished authority declares that in such cases liability must be founded on an act which is the immediate cause of harm or of injury to a right. He asserts that for the purpose of civil liability, those consequences, and those only, are deemed "immediate," "proximate," or "natural and probable," which a person of average competence and knowledge, being in the like case with the person whose conduct is complained of, and having the like opportunities of observation, might be expected to foresee as likely to follow upon such conduct.

And Judge Cooley in his great work on Torts (3d Ed.) 99, treating of the right to recover in such cases declares that it is not only necessary that damage should be suffered but the damage must be "the legitimate sequence of the things amiss." He states that the maxim of the law here applicable is, that in law "the immediate and not the remote cause of any event is regarded, and that the law always refers the injury to the proximate and not to the remote cause."

The same eminent authority also declares that if the original act was wrongful and in the ordinary course of events would prove injurious to some other person, and does in fact result in injury through the intervention of other causes which are not wrongful, the injury is to be attributed to the wrongful cause passing by those which are innocent. But, if the original wrongful act became injurious only because of the intervention of some distinct wrongful act by another, the injury is imputed to the last wrong as the proximate cause and not to the one which was more remote. See Cooley on Torts (3d Ed.) pp. 101, 104.

The defendants claim that the intervening and wrongful act of suicide was the proximate cause of the death, and that their own acts, assuming them, as we must upon demurrer, to have been committed as alleged, are not sufficient to make them responsible for the injury which resulted, but must be regarded as too remote.

[3] So that the question this court must determine is whether the wrongful acts which it is alleged the defendants committed, and which the demurrer admits they committed, can be regarded as the proximate cause of the death of the decedent. In determining that question it may be well to have in mind the rule laid down by the New York Court

of Appeals in Laidlaw v. Sage, 158 N. Y. 73, 99, 52 N. E. 679, 688 (44 L. R. A. 216), where it is said:

"A proximate cause is one in which is involved the idea of necessity. It is one the connection between which and the effect is plain and intelligible; it is one which can be used as a term by which a proposition can be demonstrated, that is, one which can be reasoned from conclusively. A remote cause is one which is inconclusive in reasoning, because from it no certain conclusion can be legitimately drawn. In other words, a remote cause is a cause the connection between which and the effect is uncertain, vague or indeterminate. * * * The proximate cause being given, the effect must follow. But although the existence of the remote cause is necessary for the existence of the effect (for unless there has been a remote cause there can be no effect), still the existence of the remote cause does not necessarily imply the existence of the effect. The remote cause being given, the effect may or may not follow."

And see Seifter v. Brooklyn Heights R. R. Co., 169 N. Y. 254, 258, 259, 62 N. E. 349.

[4] It is also desirable to keep in mind what was said in Milwaukee & St. Paul Railway Co. v. Kellogg, 94 U. S. 469, 475 (24 L. Ed. 256), that—

"The question always is: Was there an unbroken connection between the wrongful act and the injury, a continuous operation? . Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application. But it is generally held that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, 't must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances."

[5] It seems to this court that a new and independent cause intervened between the wrong and the injury, and that the suicide was not the natural and probable consequence of the wrongful acts of the defendants, and was not one which the defendants ought to have foreseen in the light of the attending circumstances. And in Pittsburgh Southern R. Co. v. Taylor, 104 Pa. 306, 315 (49 Am. Rep. 580), the court used the following language:

"In determining what is proximate cause, the true rule is that the injury must be the natural and probable consequence of the negligence, such a consequence as under the surrounding circumstances of the case might and ought to have been foreseen by the wrongdoer as likely to flow from his act."

It was laid down by Lord Ellenborough in 1807 in Vicars v. Wilcocks, 8 East, 1, that a man is answerable only for "the legal and natural consequence," not for "an illegal consequence;" that is, a wrongful act of a third person. But this opinion is now disapproved. See Lynch v. Knight (1861) 9 H. L. C. 577; Clark v. Chambers (1878) 3 Q. B. D. 327; Pollock on Torts (11th Ed.) 334. In reaching our conclusion as to the liability of the defendants in the case at bar, it is hardly necessary to say that we attach no importance to the fact of the illegality of the decedent's own act of suicide.

In the leading and well-known case of Scott v. Shepherd, 2 W. Bl. 892, the defendant threw a lighted squib into a building full of people, intending no doubt to do mischief of some kind. It fell near a person.

who, by a natural act of self-protection, cast it from him. A third person did the same, and in its third flight the squib struck another in the face and exploded, destroying the sight of one eye. Shepherd intended no such grave harm to any one, but he was held none the less liable. His act was wrongful, and the result was the natural and probable consequence. The intervening act of casting off the squib was not the act of a free agent, but was done under compulsive necessity and for self-protection, and was an inevitable consequence, and one the probability of which might have been foreseen. But in the instant case, while the original acts of the defendants were wrongful, it is claimed that the result was not the natural and probable consequence thereof.

The doctrine announced in Scheffer v. Railroad Co., 105 U. S. 249, 26 L. Ed. 1070, is applicable to the case now under consideration. In that case a passenger was injured in a railway collision being injured about his head, back, and spine. Because of his injuries it was alleged that he became disordered in mind and in his brain and spine, and his reasoning powers became prostrated and he took his life. The action was brought under the statute of Virginia giving a right of recovery when death is caused by default or neglect, the statute being similar to the New York Statute herein involved. The question came up in that case, as in this, upon a demurrer to the complaint. The Circuit Court had sustained the demurrer on the ground that the negligence of the railroad company was too remote, and that the proximate cause was the suicide of the defendant; that his death was due to his own immediate act. In that opinion the Supreme Court unanimously concurred and the judgment was affirmed. The court said:

"The argument is not sound which seeks to trace this immediate cause of the death through the previous stages of mental aberration, physical suffering, and eight months' disease and medical treatment to the original accident on the railroad. Such a course of possible or even logical argument would lead back to that 'great first cause least understood,' in which the train of all causation ends. The suicide of Scheffer was not a result naturally and reasonably to be expected from the injury received on the train. It was not the natural and probable consequence, and could not have been foreseen in the light of the circumstances attending the negligence of the officers in charge of the train. His insanity, as a cause of his final destruction, was as little the natural or probable result of the negligence of the railway officials, as his suicide, and each of these are casual or unexpected causes, intervening between the act which injured him, and his death."

We think the case decisive of this, and that no just ground of distinction exists between the two cases.

In Stevens v. Steadman, 140 Ga. 680, 79 S. E. 564, 47 L. R. A. (N. S.) 1009, the action was under a death statute of the state of Georgia similar to that existing in New York. The complaint alleged that the defendants, in pursuance of a conspiracy to bring about the death of the plaintiff's husband, had written a letter to the decedent calling upon him to resign his official position as vice president of a corporation, and advising him not to inquire into the reasons for the admonition; that, owing to the nervous condition of the decedent and his impaired mental and physical state, this letter had the effect of causing him to take a drug which caused his death; and that the defendants intended

278 F.—7

and knew that the letter would produce this effect and bring about the death of decedent.

In the above case the lower court overruled a demurrer to the complaint, and that action was reversed by the Supreme Court, which held that the writing of the letter could not be regarded as the proximate cause of the suicide; the court not being warranted in finding that the writer of the letter intended the suicide of the party to whom it was addressed, and this notwithstanding the allegations of the complaint. As to those allegations the court said that—

"When it is charged that the letter alleged to have been written by the defendants would, when read by the decedent, naturally result in a certain state of mind upon the part of the decedent, and that this 'was known' by the defendants, we are prepared to hold that this was not such a statement of fact as will withstand a demurrer. ·What is termed fact is, after all, in such cases merely a conclusion of the pleader, though it is set forth as fact and put in the place of a fact among other facts joined together in laying the foundation of the plaintiff's case. * * * Mere positiveness of the terms alleging the psychological results which we have set forth above would not prevent the court from holding, upon demurrer, that the results charged could not have been the known and natural results of the acts charged against the accused."

In the case now to be decided by us there are no allegations that the defendants intended to cause the death of the decedent.

In Daniels v. New York, New Haven & Hartford Railway Co., 183 Mass. 393, 67 N. E. 424, 62 L. R. A. 751, the action was brought under the Massachusetts statute to recover from the railroad company for negligently causing the death of one Daniels, who was injured in a collision at a railroad crossing. It appears that he had received a blow on the head and other injuries in the collision, and that these injuries caused mental disease, with the result that he committed suicide. It was held the railroad company was not liable. The court declared that the liability of a defendant for a death by suicide—

"exists only when the death is the result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the collision, and without conscious volition to .produce death, having knowledge of the physical nature and consequences of the act. An act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of the death that immediately ensues."

It declared its opinion to be:

"That the voluntary, willful act of suicide of an insane person, whose insanity was caused by a railroad accident, and who knows the purpose and the physical effect of his act, is such a new and independent agency as does not come within and complete a line of causation from the accident to the death."

We think it unnecessary to examine into the cases further. In our opinion the allegations of the complaint are insufficient to sustain a cause of action against the defendants for causing the death of the unfortunate decedent. His death was not the natural or probable consequence of what the defendants are alleged to have done, and the connection between the defendants' original acts and the final result was too remote.

If the deceased, his mind having become unbalanced because of the treatment to which the defendants subjected him, had escaped from his confinement, and, being unable to appreciate the wrongfulness of his act, had killed the first man he met, could it be said that the death was due to the acts of the defendants? We feel certain that no liability would attach to them under such circumstances. And we feel equally certain that in taking his own life, instead of that of another, the responsibility of defendants is no different.

We may say in conclusion that we concede that a course of either mental or physical torture, or of both combined, may cause a death. And we also concede that the same course or courses of torture may produce a frame of mind that desires death as a means of relief. It is conceivable, therefore, that a tortured man may kill himself. But, if he so kills himself deliberately, we hold that there is an intervening act of his own will for which the New York act affords no remedy. If, on the other hand, it is contended that his self-killing is not his own act, but is the result of suicidal mania, we hold that suicidal mania is not a natural or reasonable result of either mental or physical torture. It is a most unreasonable inference, it seems to us, to say that suicidal mania can be regarded as the natural and probable consequence of either mental or physical torture. So that, if the man does not kill himself deliberately, but his death is due to suicidal mania, which results from torture, we hold that the act of suicide cannot be regarded as the natural and reasonable result of the torture or misconduct alleged, and that the New York act affords no remedy.

We may add in conclusion that we are content to base our decision in this case solely on the authority of Scheffer v. Railroad Company, supra. If we may repeat what has been already pointed out in effect, in this case as in that, the suicide was not a result naturally and reasonably to be expected from the acts of misconduct alleged to have been committed by the defendants. It was not the natural and probable consequence. His insanity as a cause of his final destruction was as little the natural or probable result of the conduct of these defendants as his suicide, and each of these are casual or unexpected causes intervening between the acts which injured him and his death.

Judgment affirmed.

MAYER, Circuit Judge (dissenting). The complaint might, perhaps, have been more aptly drawn. It does contain some conclusions. Eliminating various allegations which either are conclusions or might not be provable as matter of law, and reducing the complaint to its narrowest limits, it is alleged that defendants "during and throughout the period from March 1, 1920, to May 3, 1920, caused the death of the said Andrea Salsedo by the following acts and conduct: * * * They inflicted upon him blows and grievous bodily injuries. * * * They threatened to inflict upon him grievous physical injury and death." It further appears that these acts were alleged to have been done while decedent was held in confinement and that during the period mentioned —i. e., on May 3, 1920—he killed himself. In other words, the complaint is drawn upon the theory that there was a continuous course of infliction of physical and mental injury, which directly caused dece-

dent "to lose control of his mind and will" and "to become  *  ,*  * mentally irresponsible."

Upon this theory, when defendant killed himself, he had no mind, and hence was incapable of understanding the nature of the act of self-destruction. If, then, he had no mind, in the sense of complete inability or disability to understand what he was doing, his suicide was not a knowing act; and, so far as he was concerned, was no act at all, and hence was not an independent intervening cause of death. It surely cannot be said that in every case suicide is an independent intervening cause of the death complained of. Whether or not suicide is an intervening independent cause, which breaks the chain of causation, is a question of fact; and, on this complaint, the wrongs of continuous physical and mental injury alleged to have been committed were, as matter of law, on this pleading the direct cause of the death of decedent.

It is, of course, fundamental that the death of decedent must be the natural result and probable consequence of the alleged wrongful acts. With the general propositions of law in that regard, and the illustrative cases cited in the court's opinion, I agree as matter of course. My view, however, is that it cannot be said, as a matter of law, that the alleged wrongs were not the proximate cause of decedent's death. The course of cause and effect is (1) injuries; (2) loss of mind; (3) death. Eliminating (2) on the ground, supra, that it was not an intervening cause, there remains nothing between (1) and (3).

It is said that the suicide was not the natural and probable consequence of the wrongful acts, and not one which defendants ought to have foreseen in the light of attending circumstances. Why not? If a man is confined against his will for over two months (March 1 to May 3), and continuously and grievously injured, and, at the same time, continuously threatened with death, can it be said, as matter of law, that the wrongdoer should not have foreseen that the infliction of such wrongs continuously over a long period of time might naturally and probably would lead to loss of mind and that self destruction might follow?

In Stevens v. Steadman, 140 Ga. 680, 79 S. E. 564, 47 L. R. A. (N. S.) 1009, I think the court was right. No one can reasonably foresee that to write a letter of the kind there described will, as a natural consequence, cause suicide. In Daniels v. N. Y.. N. H. & H. R. R. Co., 183 Mass. 393, 67 N. E. 424, 62 L. R. A. 751, it will be noted that the court regarded the suicide as "resulting from a moderately intelligent power of choice." Again, the court considered that the decedent knew "the purpose and physical effect of his act." It will be noted, however, in that case that the court said that liability of the defendant for a death by suicide—

"exists only when the death is the result of an uncontrollable impulse, or is accomplished by delirium or frenzy caused by the collision, and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act."

In the case at bar, the allegations as to loss of control of mind and will and mental irresponsibility are fully equivalent to "uncontrolled impulse  *  *  *  without conscious volition to produce death." The

foregoing, however, are, as is so often the case, expressions to explain the reason for the decision on the facts. In the Daniels Case, supra, the court was considering the charge of the trial judge, and, referring to the expression "rational volition," the court said:

"We are of opinion that the term 'rational volition,' used in the charge, was understood by the jury to mean volition attended by the powers of reason, to consider and judge of the act in all its relations, moral as well as physical, and that the charge was in this respect too favorable to the plaintiff. The burden of proof was on the plaintiff to show that the death was caused by the collision. All the evidence tended to show that the deceased, with deliberate purpose, planned to take his own life, that he closed the door and locked it with a view to exclude others and prevent interruption, and that he then took the napkin and used it effectively to strangle himself. All this points to an understanding of the physical nature and effect of his act, and to a willful and intelligent purpose to accomplish it. That he was insane, so as to be free from moral responsibility, is not enough to make the defendant liable. We are unable to discover any evidence that he was acting without volition, under an uncontrollable impulse, or that he did not understand the physical nature of his act. In the absence of any affirmative evidence for the plaintiff on this point, the jury should have been instructed to render a verdict for the defendant."

Indeed, the Daniels Case is, I think, authority in favor of the sufficiency of the complaint in the case at bar. The Daniels Case, in effect, recognizes liability when a decedent is wholly incapable of knowing what he is doing and when he acts "without volition." In Scheffer v. Railroad Co., 105 U. S. 249, 26 L. Ed. 1070 (decided in 1881), the death by suicide occurred eight months after the railroad accident. The original injury was sustained, according to the declaration, by reason of the negligent operation of the railroad train upon which the decedent was traveling. The court said:

"The argument is not sound which seeks to trace this immediate cause of death through the previous stages of mental aberration, physical suffering, and eight months' disease and medical treatment, to the original accident on the railroad."

The conclusion is based upon the proposition that the court construed the suicide as being too remote in point of fact and of time from the original accident, and also as not a result naturally and reasonably to be expected from an injury which was caused not by deliberate acts, but by a negligent act; i. e., careless operation of a train. In the case at bar, however, the acts are alleged in such manner as to be deliberate and the suicide occurred, not at a period long after the injuries were inflicted, but during the very period when they were in process of infliction.

It will not be serviceable to attempt to analyze the decisions of the courts in insurance cases, where the question of suicide has been involved. The point in this case is that on demurrer, when all doubts must be resolved in favor of the pleader, this complaint shows a state of facts from which it may fairly follow that the death was not the result of an independent intervening act, but the proximate result of acts whose consequence could reasonably have been foreseen.

On a trial the allegations may turn out to be unfounded, but we are

now dealing not with their merits, but solely with their effect as matter of pleading. I think, therefore, that the complaint states a cause of action, and that the judgment should be reversed.